Fritz **THOMPSON**, Individually and as Sole Beneficiary of the Estate of Helen Thompson, Deceased,

v.

The **UNITED STATES**.

No. 290-53.

United States Court of Claims.

Nov. 7, 1956.

E. Byron Singleton, Amarillo, Tex., Singleton & Trulove, Amarillo, Tex., on the brief, for plaintiff.

David R. Frazer, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe and Edward W. Rothe, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The question presented is whether the profits realized in the years 1946 to 1949 by plaintiff from the sale of lots in a 100-acre tract purchased by him in 1942 are taxable as capital gains or as ordinary income derived by plaintiff in the ordinary course of his trade or business.

Plaintiff was a County Commissioner of Hutchinson County, Texas. As such he was in charge of acquiring the right-of-way for the construction of State Highway 117, which was laid out to run through some land adjacent to the town of Borger, Texas, owned by a family known as the Weatherlys. After acquisition of the highway, plaintiff bought for his own account 100 acres of the Weatherlys land that lay on each side of the new highway, for $5,000.

Shortly after plaintiff's purchase, the Phillips Petroleum Company considerably expanded its refining facilities located about two miles from Borger, and the Defense Plants Corporation began the erection of a synthetic rubber plant about 3 miles from Borger. This caused the influx of thousands of construction workers, creating a serious housing shortage, to such an extent that many people were living in shacks, crowded close together,

with no sewers or a sanitary water supply. More and better housing facilities was a crying need. The owners of land did not need to look for a buyer. People were clamoring to buy.

When plaintiff purchased the 100-acre tract there were a number of shanties on it, erected by tenants who paid a certain ground rental. These people occupied two different areas on the tract. They desired to purchase lots on which to build more substantial houses, but they were too poor to pay cash for them. Plaintiff agreed to sell them lots in the northwest corner of the tract on the installment plan, and he platted this portion of his property into lots and streets and alleys for this purpose. This left the remainder of the property available for sale to more desirable purchasers.

Much of the property was hilly and traversed by deep ravines, which necessitated considerable cutting and filling and grading, in order to make it suitable for residential purposes. Plaintiff spent $39,660.65 for levelling, grading, and filling up holes and gulleys. He spent $18,-235.50 for paving streets, $7,600.92 for sidewalks, and $1,708.20 for drainage facilities. There was some expense for engineering services, attorney's fees, and platting, making a total expenditure for putting the property in shape, so that lots could be sold, of about $80,500. This was about 16 times what plaintiff had paid for the entire tract.

Plaintiff sold 59 lots in 1945, 63 in 1946, 28 in 1947, 29 in 1948, 20 in 1949, 33 in 1950, and 21 in 1951. From sales during 1944 to 1949 he realized gross income, incurred expense, and realized net profit as follows:

| Year | Gross Sales | Expenses and Cost of Lots | Net Profit |
|---|---|---|---|
| 1944 | $1,475.00 | $987.55 | $487.45 |
| 1945 | 22,566.50 | 10,790.95 | 11,775.55 |
| 1946 | 60,639.20 | 34,258.38 | 26,380.82 |
| 1947 | 28,850.00 | 15,087.67 | 13,762.33 |
| 1948 | 36,959.30 | 17,737.13 | 19,222.17 |
| 1949 | 29,451.50 | 11,761.05 | 17,690.45 |
| Totals | $179,941.50 | $90,622.73 | $89,318.77 |

During the years 1945–1949, about 65 percent of plaintiff's income came from the sale of these lots. In no one of these years was it less than 50 percent. It follows that quite a substantial part of plaintiff's business during these five years was the sale of these lots.

This was not a case of merely buying a piece of property, holding it until a rise in the market, and then selling it. After plaintiff's purchase of the property, he spent time and effort in segregrating undesirable tenants, in making extensive improvements on it to increase the sale price of the balance, and in handling the sales. In the five years he sold a total of 199 lots, an average of about 40 a year, and realized a total profit of about $84,-000, or about 17 times his original investment.

■ Whether sales are in the ordinary course of business or are capital gains depends on the facts of the particular case. Some of the cases dealing with this question are cited in our opinions in Garrett v. United States, 120 F.Supp. 193, 128 Ct.Cl. 100, and in McConkey v. United States, 130 F.Supp. 621, 131 Ct.Cl. 690. In both of these cases sales in the process of liquidation of estates were involved. They are not in point here, and are mentioned only for their statements of the general principle governing the determination of the question before us, and for the cases cited in them.

■ Taking into consideration the extensive improvements made on the property, the length of time required to dispose of the property, the time spent by taxpayer in preparation for and in making the sales, and the large percentage of plaintiff's total income which was derived from the sale of these lots in the years in question, we must conclude that for these years a substantial part of taxpayer's business was the sale of the lots and, therefore, that they were sold in the ordinary course of his trade or business, and are taxable as ordinary income.

Plaintiff's petition is dismissed.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.