Simon M. LAZARUS and Mina Lazarus

v.

UNITED STATES.

No. 66-56.

United States Court of Claims.

April 8, 1959.

George T. Altman, Beverly Hills, Cal., for plaintiffs.

Rufus E. Stetson, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Herbert

S. Fessenden, Washington, D. C., was on the brief.

## PER CURIAM.

The issue in this case is whether the proceeds of the sale of certain properties should be treated for tax purposes as capital gain or ordinary income.

The trial commissioner was directed to make findings of fact and to recommend conclusions of law. Pursuant to such direction these have been filed.

The court having considered the evidence, the briefs and the argument of counsel adopts the findings, opinion and recommendation of Trial Commissioner Mastin G. White.

Since the trial commissioner's findings and opinion were filed, the court rendered its opinion in the case of Boeing v. United States, 168 F.Supp. 762, involving the same general issue. The defendant insists that the Boeing decision should govern the instant case. We think the instant case is clearly distinguishable on the facts and that the cited case is therefore inapposite. We have briefly discussed these distinctions in the appendix at the end of the court's findings of fact and conclusion of law.

Plaintiffs are entitled to recover with interest thereon as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S. C.A.

It is so ordered.

## Opinion of the Commissioner

This case grew out of a controversy as to whether the profits derived by the plaintiffs in 1950 from the sale of certain parcels of land constituted a capital gain or ordinary income.

The plaintiffs are husband and wife. They reside in California, where the system of community property in marriage prevails, and all the income involved in this case was community income. Plaintiff Simon M. Lazarus (who will usually be referred to hereinafter as "Lazarus") managed the plaintiffs' community property at all times pertinent to this case, and his actions discussed in this opinion were taken by him on behalf of the community estate.

Lazarus has been continuously engaged in the business of operating motion-picture theaters since 1917. In 1943 and 1944, he assembled approximately 76 acres of land within the outer limits of the City of Los Angeles for the purpose of establishing a farm. The farm was operated by Lazarus as an avocation from 1944 until November 1949, and it was used by Lazarus and his wife as their home during the period 1945–1949. In operating the farm, Lazarus had the assistance of a full-time farm hand until sometime in 1948, and thereafter he was assisted by a part-time farm hand.

In 1946, Lazarus decided to construct a drive-in motion-picture theater on part of his farm, and he decided to sell another part of the farm as a means of raising money with which to finance the drive-in theater project. A 24-acre portion of the farm was selected for sale, and preliminary steps to convert this area into a 32-lot subdivision of the City of Los Angeles were taken. The tentative subdivision was designated as Tract 14471. Difficulties were encountered, however, in connection with the proposal to establish a drive-in theater on Lazarus' property, and that project was ultimately abandoned in April 1948.

At the time of the abandonment of the drive-in theater project, Lazarus was in need of money for his existing theaters. Consequently, he proceeded with the plan for the establishment of Tract 14471 as a subdivision for sale. This involved, among other things, the making of certain improvements that were required by an ordinance of the City of Los Angeles, including the installation of water mains, fire hydrants, public utility service connections, and drainage facilities and the paving of certain streets and walks.

After Tract 14471 had been established as a completed subdivision, with the 32 lots recorded and ready for sale, Lazarus offered to sell the subdivision as a single parcel to two different people, but neither was interested in purchasing the property at the price fixed by Lazarus. He then turned over the sale of the lots in Tract 14471 to an independent real estate broker, who undertook to sell the lots on a commission basis. The actual sale of lots in Tract 14471 was begun in 1949, and 25 of the lots were sold during that year.

In 1950 (the year that is involved in this suit), Lazarus completed arrangements for the conversion of another portion of the farm into a subdivision for sale. That subdivision was designated as Tract 15746. It consisted of approximately 47½ acres and was subdivided into 80 lots. The sale of lots in Tract 15746 was also undertaken on a commission basis by the same broker who was handling the sale of lots in Tract 14471.

During the year 1950, 7 lots in Tract 14471 were sold for a total of $21,450 and 12 lots in Tract 15746 were sold for a total of $42,850. Hence, the aggregate amount derived from the sale of lots in 1950 was $64,300.

The plaintiffs filed a joint income tax return for the calendar year 1950, showing a net income of $9,666.46 and taxes due in the amount of $1,470.06. This return indicated that profits in the amount of $33,716.36 had been derived by the plaintiffs from the sale of the lots mentioned in the preceding paragraph, and these profits were treated by the plaintiffs as a capital gain for income tax purposes.

Thereafter, following an examination by an internal revenue agent of the plaintiffs' income tax returns for 1950 and for certain other years, of work sheets prepared by the plaintiffs' accountants, and of the records of an insurance company respecting a loan that was made to the plaintiffs for the purpose of improving Tract 15746, the Internal Revenue Service determined in 1954 that the profits derived by the plaintiffs from the sale of lots in 1950 amounted to $35,136.69, instead of the amount reported by the plaintiffs ($33,716.36). The Internal Revenue Service concluded that such profits constituted ordinary income and not a capital gain, as asserted by the plaintiffs. No other question was raised by the Internal Revenue Service respecting the plaintiffs' income tax return for 1950.[1]

The plaintiffs were informed by the Internal Revenue Service of the adjustments mentioned above, and an additional payment in the amount of $8,078.47 was demanded by the Internal Revenue Service. That amount was paid by the plaintiffs, and the present suit was subsequently instituted for its recovery (plus interest).

In this litigation, the plaintiffs state that they are willing to concede the correctness of the $35,136.69 figure used by the Internal Revenue Service as the amount of the plaintiffs' profits from the sale of lots in 1950, and that they only contest the action of the Internal Revenue Service in treating such profits as ordinary income rather than as a capital gain.

In situations where taxpayers acquired sizeable tracts of land and subsequently decided to offer the property for sale to the public as subdivided acreage, the courts have frequently been called upon to determine whether profits derived from such sales constituted ordinary income or capital gains. Under the pertinent statutory provision, the basic question in each of these cases has been whether the parcels of land sold by the taxpayer came within the category of "property held by the taxpayer primarily for sale to customers in the ordinary

---

[1]. A deduction made by the plaintiffs for medical and dental expenses was eliminated by the Internal Revenue Service because the amount claimed by the plaintiffs for that item was less than 5 percent of the plaintiffs' gross income in 1950, as corrected by the Internal Revenue Service on the basis stated above.

course of his trade or business".[2] If so, the profits have been held to be ordinary income. Otherwise, the profits have been held to constitute a capital gain.

■ Perhaps the only guiding principle of general application that can be gleaned from the judicial decisions dealing with the problem referred to in the preceding paragraph is that every case of the type mentioned must be decided on the basis of its own facts, there being no single test that can be applied to all such cases with decisive results. Garrett v. United States, 1954, 120 F.Supp. 193, 128 Ct.Cl. 100, 104; Mauldin v. Commissioner of Internal Revenue, 10 Cir., 1952, 195 F.2d 714, 716; Victory Housing No. 2 v. Commissioner of Internal Revenue, 10 Cir., 1953, 205 F.2d 371, 372. There are, however, several factors that courts have considered in disposing of such cases.

■ One of the factors regarded by courts as pertinent is the purpose for which the land was originally acquired— i. e., whether it was originally purchased for the purpose of resale or was acquired for some other purpose. For example, in Berberovich v. Menninger, D.C.E.D. Mich.1957, 147 F.Supp. 890, 892, the court emphasized the fact (along with other matters) that the land under consideration had been originally purchased by the taxpayer for a farm in holding that profits from the sale of lots carved out of the farm should be treated as a capital gain for income tax purposes, and not as ordinary income. On the other hand, although the fact that the land involved in Mauldin v. Commissioner of Internal Revenue, supra, had originally been acquired by the taxpayer for a purpose other than resale was regarded by the court as worthy of consideration, it was nevertheless held (195 F.2d at page 717) that this particular circumstance was outweighed by other facts leading to

the conclusion that the taxpayer subsequently utilized the land to engage in the business of selling lots.

If only the "purpose of original acquisition" test were applied to the facts of the present case, it would necessarily be decided that the profits realized by the plaintiffs from the sale of their lots constituted a capital gain rather than ordinary income from the business of selling realty. The plaintiffs' land was originally purchased for a farm, and not for resale. The decision to subdivide and dispose of the property was made some years after its acquisition, and because of changed circumstances.

Another factor that has had considerable weight with courts in deciding cases similar to the present one is the motive of the taxpayer in selling the property as subdivided acreage. In Garrett v. United States, supra, 120 F.Supp. at page 196, 128 Ct.Cl. at page 105; Victory Housing No. 2 v. Commissioner of Internal Revenue, · supra, 205 F.2d at pages 372–373; Fahs v. Crawford, 5 Cir., 1947, 161 F.2d 315, 317; Dillon v. Commissioner of Internal Revenue, 8 Cir., 1954, 213 F.2d 218, 220; Chandler v. United States, 7 Cir., 1955, 226 F.2d 403, 406; and Curtis Co. v. Commissioner of Internal Revenue, 3 Cir., 1956, 232 F.2d 167, 170, the respective courts were influenced by the fact that in each instance the taxpayer's purpose in selling the particular land as subdivided acreage was to liquidate an investment or an estate. It was held in these cases that the profits from sales constituted capital gains, and not ordinary income. However, despite the apparent presence of a liquidation motive in the cases of Ehrman v. Commissioner of Internal Revenue, 9 Cir., 1941, 120 F.2d 607, 610, certiorari denied 314 U.S. 668, 62 S.Ct. 129, 86 L.Ed. 534, and Home Co. v. Commissioner of Internal Revenue, 10 Cir., 1954, 212 F.2d 637, 641, it was decided on the

---

2. Sec. 1221(1), Internal Revenue Code of 1954, 26 U.S.C.A. § 1221(1); formerly Sec. 117(a) (1) (A), Internal Revenue Code of 1939, as amended, 26 U.S.C.A. § 117(a) (1) (A). The quoted phrase, minus "to customers" and "ordinary", apparently had its origin in Sec. 208(a) (8), Revenue Act of 1924 (43 Stat. 253, 263).

basis of other factors that profits from sales of subdivided acreage were ordinary income.

In the present case, it was the plaintiffs' purpose, in selling the lots in Tracts 14471 and 15746, to convert into cash an investment in land for a farm that had been made by the plaintiffs several years earlier. The cash was needed primarily in connection with the plaintiffs' motion-picture theater business. None of the proceeds from the sale of the lots was ever used by the plaintiffs to buy additional realty for resale, and no other funds of the plaintiffs were ever used for that purpose. Therefore, the exclusive application of the "motive in selling" test in the present case would uphold the plaintiffs' contention that the profits derived from the sale of the lots constituted a capital gain rather than ordinary income from the business of selling realty.

A third criterion that courts have utilized in cases of this sort is the extent of the time and effort devoted by the taxpayer to selling the parcels of land or to other sales-related activities. The fact that the several taxpayers personally devoted relatively little time and effort to the respective realty projects involved in McConkey v. United States, 1955, 130 F.Supp. 621, 131 Ct.Cl. 690, 694; Phipps v. Commissioner of Internal Revenue, 2 Cir., 1931, 54 F.2d 469, 470–471; Ross v. Commissioner of Internal Revenue, 5 Cir., 1955, 227 F.2d 265, 269; and Fahs v. Crawford, supra, 161 F.2d at page 317, was stressed by the courts in deciding that the taxpayers in those cases had not been engaged in the real estate business, and that their profits from sales of subdivided acreage were not ordinary income but capital gains. However, the cases of Welch v. Solomon, 9 Cir., 1938, 99 F.2d 41, 43, and Brown v. Commissioner of Internal Revenue, 5 Cir., 1944, 143 F.2d 468, 470, were decided against the taxpayers despite the fact that they had devoted comparatively little time or effort to the realty projects involved in those cases.

The real estate projects with which we are concerned in this case required very little of Lazarus' time or attention. He apparently contracted for the performance of the engineering work that was necessary in connection with the establishment of the subdivisions and for the making of the improvements that were required by a city ordinance.[3] Then, after offering to sell the first subdivision as a single parcel to two different people, Lazarus turned over the task of selling the lots in the subdivisions to an independent real estate broker, who was looking for listings of property for sale and approached Lazarus with respect to the sale of the latter's lots. All sales of lots in the two subdivisions were made on a commission basis by the broker and the salesmen whom he selected for that purpose. Lazarus did not supervise or participate to any extent in the sales activities, except that he approved the prices that were fixed for the lots and he signed the sales contracts and the deeds to the lots as they were sold. He had no contacts whatever with purchasers or prospective purchasers of lots. Meanwhile, during the earlier stages of the sale of lots, Lazarus was devoting most of his time to his principal business of operating motion-picture theaters, and he was devoting a substantial amount of time to his avocation of operating a farm. Then, during 1950 (the year that is involved in this suit), Lazarus' motion-picture theater business was occupying his full time. Consequently, if the factor of personal participation by the taxpayer in the making of sales or in sales-related activities were of controlling importance in the present case, it would necessarily be held that Lazarus' exceedingly limited activities in connection with the disposition of the lots were not sufficient to put Lazarus in the business of selling realty or to bring the lots within the category of "property

---

3. The record is not entirely clear with respect to the performance of the engineering work and the making of improvements on Tract 15746.

held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

The frequency of sales and the continuity of sales-related activities provide another test that courts have applied in disposing of cases similar to the one now under consideration. In Dunlap v. Oldham Lumber Co., 5 Cir., 1950, 178 F.2d 781, 784–785, which involved an average of 17 realty sales per year over a two-year period, the court indicated that the infrequency of the sales was an important factor in influencing the court to conclude that the taxpayer was not engaged in the real estate business. Conversely, in Rollingwood Corp. v. Commissioner of Internal Revenue, 9 Cir., 1951, 190 F.2d 263, 266, where an average of approximately 400 sales per year were made over a two-year period, in Ehrman v. Commissioner of Internal Revenue, supra, 120 F.2d at page 610, where an average of 153 sales per year were made over a two-year period, and in Brown v. Commissioner of Internal Revenue, supra, 143 F.2d at page 470, where the realty sales averaged slightly more than 26 per year over a three-year period, the courts emphasized the frequency and continuity of the transactions in deciding that the parcels of land sold in those cases had constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

In the present case, 25 of the plaintiffs' lots and an additional 1½-acre parcel of unsubdivided acreage were sold in 1949, 19 lots were sold in 1950, 22 lots and a 3-acre parcel of unsubdivided acreage were sold in 1951, and 24 lots were sold in 1952. Hence, the sales transactions averaged 23 per year over a four-year period. Although the sales transactions in the present case were not particularly frequent, the evidence indicates that a sustained attempt was made by the broker throughout the four-year period to dispose of the plaintiffs' lots (along with other properties that were being handled by the broker). When the complete picture in this re-spect is considered, it is my opinion that the exclusive application to this case of the "frequency and continuity of transactions" test would lead to a decision that the profits from the sale of the plaintiffs' lots constituted ordinary income.

An additional criterion that courts have applied in dealing with this problem is the extent of the improvements made in subdividing the property and preparing it for sale to the public. In McConkey v. United States, supra, 130 F.Supp. at pages 622 and 623, 131 Ct. Cl. at pages 692 and 694; Ross v. Commissioner of Internal Revenue, supra, 227 F.2d at page 269; and Berberovich v. Menninger, supra, 147 F.Supp. at page 893, the courts mentioned the fact that few or no improvements were made by the taxpayers on the respective subdivisions in holding that profits from the sale of the parcels of land involved in those cases constituted capital gains rather than ordinary income. Conversely, in Thompson v. United States, 1956, 145 F.Supp. 534, 136 Ct.Cl. 671, 673, 674, and in Shearer v. Smyth, D.C.N.D. Cal.1953, 116 F.Supp. 230, 232, affirmed 9 Cir., 1955, 221 F.2d 478, certiorari denied 350 U.S. 840, 76 S.Ct. 78, 100 L. Ed. 749, the fact that extensive improvements were made by the taxpayers in subdividing their property was stressed by the courts in concluding that profits realized from the sale of the subdivided acreage constituted ordinary income from the conduct of a business, rather than capital gains.

In the present case, extensive improvements were made to the plaintiffs' subdivisions. The improvements that were made to Tract 14471 cost a total of $41,-031.01, and the improvements that were made to Tract 15746 cost a total of $46,-706.80. Although all the improvements to Tract 14471 (and perhaps those to Tract 15746) were required by an ordinance of the City of Los Angeles, the improvements were nevertheless made by the plaintiffs for the purpose of increasing the marketability of the property. The extent of the improvements made for

this purpose would tend to indicate a plan on the part of the plaintiffs to engage in the business of selling lots. Hence, if only the extent of the improvements were considered in the present case, the result would be unfavorable to the plaintiffs' position.

Courts have also considered the relation of the taxpayer's profits from the sale of his subdivided acreage to the taxpayer's total income in determining whether such profits constituted ordinary income from a real estate business conducted by the taxpayer or a capital gain. For example, the fact that the taxpayer's profits from realty sales constituted a comparatively small percentage of his total income was influential in causing the court to decide Berberovich v. Menninger, supra, 147 F.Supp. at page 893, in a manner favorable to the taxpayer's contention that such profits were not ordinary income from the operation of a business; whereas the comparatively high percentage of the taxpayers' total income that was derived from realty sales influenced the courts in deciding Thompson v. United States, supra, 145 F.Supp. at page 535, 136 Ct.Cl. at page 673, and Mauldin v. Commissioner of Internal Revenue, supra, 195 F.2d at page 717, contrary to the taxpayers' position.

In the case now before the court, it appears that the plaintiffs' income over a four-year period was derived largely from sales of realty. On the basis of the plaintiffs' income tax returns, there was no actual income from the plaintiffs' motion-picture theater business or from any other source except realty sales in 1949,[4] 1951, or 1952. In 1950 (the year involved in this suit), the plaintiffs' income tax return indicated that 89 percent of the plaintiffs' total income was derived from sales of realty and only 11 percent was received from other sources, including the plaintiffs' motion-picture theater business. Hence, the exclusive application of the "proportion of total income" test to the facts of the present case would result in a determination unfavorable to the plaintiffs on the question of whether the profits that they derived from the sale of lots in 1950 constituted a capital gain or ordinary income from the conduct of a real estate business.

The various criteria that have been previously mentioned are merely aids to be used in determining the basic question of whether a taxpayer, in selling subdivided acreage, was or was not engaged in the *business* of selling realty. The statutory standard, as previously indicated, is whether the subdivided acreage in such a case constituted "property held by the taxpayer primarily for sale to customers in the ordinary course of his [i. e., the taxpayer's] trade or business". Of course, it must be borne in mind that a taxpayer can be engaged in two or more businesses at the same time (Camp v. Murray, 4 Cir., 1955, 226 F.2d 931, 934; Dunlap v. Oldham Lumber Co., supra, 178 F.2d at page 784; and Fahs v. Crawford, supra, 161 F.2d at page 317), and that one can engage in the business of selling realty by supervising employees or agents who have the actual contacts with customers, as well as by personally participating in sales activities (see Welch v. Solomon, supra, 99 F.2d at page 43; Galena Oaks Corp. v. Scofield, D.C.S.D.Tex.1953, 116 F., Supp. 333, 335, affirmed 5 Cir., 1954, 218 F.2d 217; and Snell v. Commissioner of Internal Revenue, 5 Cir., 1938, 97 F.2d 891, 893). Nevertheless, the basic question is whether the taxpayer played such a role in the program for the disposition of his property as to warrant a determination that he was engaged in the *business* of selling realty.

4. The plaintiffs' 1949 income tax return indicated that a salary of $10,400 had been received by Lazarus from a wholly owned corporation through which he operated the plaintiffs' motion-picture theaters, but that a loss in the amount of $11,496.23 had been sustained as a result of the abandonment of the drive-in theater project. Apparently, losses from the operation of the plaintiffs' theaters in 1951 and 1952 also exceeded any salary payments that were received in connection with the operation of the theaters.

When the present case is considered in the light of the statutory standard, it must be concluded, in my opinion, that the plaintiffs in 1950 were not engaged in the business of selling lots. Carrying on such a business ordinarily involves holding one's self out to others as engaged in it. See Deputy v. du Pont, 1940, 308 U.S. 488, 499, 60 S.Ct. 363, 84 L.Ed. 416. This was never done by the plaintiffs. Rather, they turned over to an independent real estate broker the task of liquidating an investment in land that the plaintiffs had made some years earlier for the purpose of establishing a farm. The fact that the farm was sold in the form of small parcels rather than as a single tract was not sufficient to change what was essentially the liquidation of a capital investment by the plaintiffs into the conduct of a real estate business by the plaintiffs. Curtis Co. v. Commissioner of Internal Revenue, supra, 232 F.2d at pages 169–170; Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, 357.

██ It is the policy of the income tax law "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions". Burnet v. Harmel, 1932, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. Therefore, it is my opinion that the plaintiffs in the present case are entitled to receive capital-gains treatment on the profits derived by them from the conversion of their long-term investment in land into cash that was needed for their motion-picture theater business and other purposes.

It necessarily follows that the court should, in my opinion, enter a judgment for the plaintiffs. The determination of the amount of the judgment may appropriately be reserved for further proceedings pursuant to Rule 38(c).

#### Findings of Fact

1. The plaintiffs are husband and wife. They reside in California.

2. All the income involved in this case was community income. Plaintiff Simon M. Lazarus (who will usually be referred to in these findings as "Lazarus") managed the community property at all times pertinent to this proceeding. Actions or ownership attributed to Lazarus in these findings were taken or held by him on behalf of the community estate.

3. Lazarus had been continuously engaged in the business of operating motion-picture theaters from 1917 until the date of the trial in this case. At times, the theaters operated by him were individually owned by Lazarus, and at other times they were owned by a corporation, which was, in turn, owned by Lazarus. During the period between 1937 and 1947, he was engaged in a joint operation of four theaters with Fox West Coast, the latter owning a 51 percent interest in the four theaters and Lazarus owning the remaining interest. During that period, personnel of Fox West Coast did most of the work in connection with the operation of the four theaters, it only being necessary for Lazarus to go to the office once or twice a week in order to sign checks and make out bookings. In 1947, following the divorcement of motion picture production from exhibition as a result of action by the Federal Government, the joint operation of theaters by Lazarus and Fox West Coast was terminated. In the dissolution of the association, Fox West Coast took over two of the four theaters and Lazarus took over the other two theaters, the ownership of which was vested in a corporation wholly owned by Lazarus, namely, the M & S Theater Corporation. Thereafter, it was necessary for Lazarus actively to manage the theaters that he retained upon the termination of his association with Fox West Coast; and, as a result, the greater part of each working day was devoted by him to the theater business. However, during the period from 1947 through November 1949, Lazarus did not go to his theater office on weekends, and he customarily left the office on work-day afternoons in time to get home by 3:00 p. m. Beginning in December 1949 and continuing through

1950, 1951, and 1952, Lazarus devoted full time to the theater business.

4. On December 31, 1943, Lazarus acquired by purchase an undivided one-half interest in certain acreage within the portion of the City of Los Angeles, California, known as Tarzana. The co-purchaser was one Regina Hill, who similarly acquired an undivided one-half interest in the land. The purchase involved a total of more than 500 acres; but almost immediately thereafter, the Board of Education bought approximately 400 acres of the land. On February 3, 1944, the portion of the acreage retained by Lazarus and Regina Hill was partitioned between them, each thereby acquiring the sole ownership of one-half of the property partitioned. Lazarus' half consisted of approximately 73 acres; and the purchase price paid by him for this parcel amounted, in effect, to $10,043.32.

5. Shortly after the partition of the property referred to in finding 4, Lazarus acquired two other pieces of land that were contiguous to the 73-acre parcel obtained by him as a result of the partition. One of these, consisting of approximately 1½ acres, was acquired at a cost of $7,500 for the purpose of eliminating a jog in the property line of the 73-acre parcel. The other, which also consisted of approximately 1½ acres, was acquired at a cost of $1,100 for the purpose of improving access to the 73-acre parcel. With these two additional pieces of land, the property acquired by Lazarus represented a total of approximately 76 acres. The property was bounded on the west by Winnetka Street and on the south by Ventura Boulevard.

6. The total purchase price paid by Lazarus for the 76 acres amounted to $18,643.32. This total was made up of: (a) $10,043.32 representing the purchase price of the 73-acre parcel initially acquired; (b) $7,500 representing the purchase price of one of the small parcels subsequently acquired; and (c) $1,-100 representing the purchase price of the other small parcel subsequently acquired by Lazarus.

7. (a) When Lazarus acquired the 76 acres, he intended to use the land for a farm. He built a wire fence around the property, purchased some calves, and put them on the land. However, the cattle-raising venture was a failure, and it was discontinued not later than the early part of 1945. Corn was planted on the property one year, in 1944 or 1945, and it may have been planted a second year. There were bearing walnut trees on 14 or 15 acres of the land, and nuts were harvested from these trees in commercial quantities for two or three years after the acquisition of the land by Lazarus. One year, the proceeds from the walnut crop amounted to several thousand dollars. Lazarus cut down and removed a line of spruce trees, 180 to 200 in number, with the expectation of planting an additional walnut grove on the cleared area, but the additional walnut trees were never planted. Leveling was done on a 12-acre area in the northeastern portion of the property for a commercial orange grove; a chain-link fence was built around this area; and from 500 to 1,000 young orange trees were planted there, beginning in 1945. A stable and related farm buildings, designed primarily to house equipment and supplies, were built. Farm machinery and equipment, including a jeep, were purchased.

(b) The orange grove was started because of advice received by Lazarus to the effect that within five or six years, when the trees began bearing, the grove would bring him quite a substantial profit. However, after about two years, the growth of the trees being very poor, Lazarus learned that the ground in which they were planted was not good for orange trees.

8. Lazarus had the full-time services of a man on the farm from about the time of its establishment until sometime in 1948. Thereafter, for the remainder of 1948 and for eight or nine months in

1949, Lazarus had the part-time help of a boy who would come from a nearby college and help on the farm whenever assistance was necessary. The boy usually worked on the farm several days in each week, and for several hours per day. Lazarus himself did very little work on the farm prior to 1947; but from 1947 through November 1949, he worked on the farm during weekends and after 3:00 o'clock on other afternoons.

9. Soon after the end of World War II, Lazarus built a little, square, one-story, two-unit dwelling house on the farm. The house was situated at one end of the 12-acre fenced-in area that included the young orange grove. Each unit of the dwelling house consisted of three small rooms. One unit was intended for the farm hand, and it was occupied by him and his wife until the full-time farm hand left sometime in 1948. After the full-time farm hand left, no laborer lived on the farm. The other unit was intended for Lazarus and his wife, and they occupied it until the end of November 1949.

10. Early in 1946, Lazarus decided to build a drive-in motion-picture theater on his land. On March 25, 1946, he filed plans for the drive-in theater with the Los Angeles Building and Safety Department. It was to be a single-screen theater, and was to be located on the portion of the property near Ventura Boulevard. On April 24, 1946, a permit to build a foundation for the drive-in theater was issued by the City of Los Angeles. On May 2, 1946, Lazarus made application to the Civilian Production Administration of the United States for permission to build the theater, such permission being required under that agency's C. P. A. Order No. 1. This application was denied on May 18, 1946.

11. On June 1, 1946, the zoning regulations of the City of Los Angeles were changed so as to eliminate the area where Lazarus' land was located from the zones in which theaters could be built. However, on July 18, 1946, Lazarus was granted a 90-day extension of the permit to build a foundation for a theater on his land; and on August 5, 1946, a ruling was issued by the Zoning Administrator of the City of Los Angeles that the permit was still valid and would continue to be effective until the expiration of a 30-day period following the rescission of the Federal regulations prohibiting such construction (C. P. A. Order No. 1).

12. Shortly after the events referred to in finding 11, Lazarus decided to sell part of his land. It was then his intention that the proceeds would be used principally to help finance the drive-in theater mentioned in findings 10 and 11. On September 3, 1946, he entered into a contract with Willard T. Nelson whereby the latter was to do the engineering work necessary in subdividing a portion of the 73-acre parcel initially acquired (see finding 4) into a subdivision for sale. On the same date, the City of Los Angeles assigned the designation Tract 14471 to the proposed subdivision. On September 4, 1946, a tentative plat of Tract 14471 was submitted to the proper authorities of the City of Los Angeles. This tract consisted of 24 acres in the eastern part of the 73-acre parcel. It contained the walnut trees mentioned in finding 7, and was regarded by Lazarus as the most saleable part of the property. Tract 14471 was divided by the tentative plat into 32 lots. The purchase price of the land comprising Tract 14471 was $3,301.91.

13. Lazarus abandoned the walnut grove in 1946 because that part of the property was affected by the plans respecting the drive-in theater and the subdivision.

14. On September 26, 1946, the City Engineer of the City of Los Angeles advised the City Planning Commission of his approval of the tentative plat for Tract 14471, subject to the making by Lazarus of certain improvements on the property, including the installation of water mains, fire hydrants, public utility

service connections, and drainage facilities, and the paving of certain streets and walks, all to the satisfaction of the City Engineer. These improvements were required pursuant to an ordinance of the City of Los Angeles.

15. On October 8, 1946, the City Planning Commission approved the tentative map of Tract 14471, subject to the City Engineer's stated requirements as to improvements. On October 30, 1946, a final map, which incorporated the City Engineer's stated conditions, was filed with the City Engineer, and on January 21, 1947, it was given final approval by him. On March 20, 1947, Lazarus signed a promissory note for $40,000 in order to obtain a loan from the Pacific Mutual Life Insurance Company for the purpose of financing the required improvements on Tract 14471.

16. Opposition developed to a drive-in theater being constructed on the portion of Lazarus' property near Ventura Boulevard, and he revised his plans for the theater so as to change the proposed site to a location some 300 or 400 feet away from Ventura Boulevard. He also changed his plans by substituting a proposed two-screen theater for the single-screen theater originally contemplated, thereby increasing the area of land that would be required for the drive-in theater.

17. The developments referred to in finding 16 made any further action looking toward the disposition of Tract 14471 seem infeasible, since the area that had been platted as Tract 14471 would be needed for the two-screen theater at the new location provided for in the revised plans respecting the drive-in theater.

18. On August 15, 1947, Lazarus made a contract with certain architects whereby the latter were to prepare plans for the construction of the two-screen drive-in theater referred to in finding 17. He thereafter applied on October 2, 1947 to the Zoning Administrator of the City of Los Angeles for a variance from the zoning regulations (see finding 11) so that he could use a portion of his land for a drive-in theater. An order granting the variance was issued on January 26, 1948, the variance being subject to certain conditions that had to be complied with in the construction of the theater. On April 1, 1948, C. P. A. Order No. 1, which had theretofore prevented non-residential construction, was rescinded; and on April 22, 1948, a revised permit was issued by the City of Los Angeles for the construction of the two-screen drive-in theater on Lazarus' property. On April 30, 1948, bids for the construction of the theater was opened by the architects, and the estimated cost of the construction alone was shown to be $133,000. On the same date, Lazarus decided to, and did, abandon the drive-in theater project.

19. Lazarus' reasons for abandoning the drive-in theater project were two-fold. The main reason was that on the very day when the bids were opened, he learned that construction was being started on another drive-in theater located only about 1½ or 2 miles from the site of his proposed theater. A second reason was that he regarded the cost as prohibitive. The architects in August 1947 had estimated the cost of Lazarus' proposed theater, including fixtures, at about $100,000; but when the bids were opened on April 30, 1948, it appeared that the cost of the theater, including fixtures, would be about $175,000.

20. Following the abandonment of the drive-in theater project, Lazarus once more began to take steps looking toward the establishment of Tract 14471 as a subdivision for sale. His purpose was to raise money for his theaters, which had been slipping badly since the dissolution of his partnership with Fox West Coast. On June 25, 1948, he submitted to the proper city authorities a request for a one-year extension of the time within which to file a final map of Tract 14471. This request was granted on July 22, 1948. On October 29, 1948, the subdivision was approved by the City Council, and the final map was re-

corded on the same date. Thereafter, Lazarus entered into contractual arrangements whereby the improvements on the subdivision required by the City Engineer pursuant to an ordinance of the City of Los Angeles (see finding 14) were made. Lazarus did not make any other improvements on the subdivision. The cost of the required improvements was paid, to the extent of $38,639.81, by the Pacific Mutual Life Insurance Company out of a loan fund credited by it to Lazarus for that purpose; and the company was later repaid out of the proceeds derived from the sale of lots in Tract 14471. In addition, a total of $2,391.20 was paid out on these improvements by Lazarus. The total cost of the improvements on Tract 14471 thus amounted to $41,031.01.

21. After Tract 14471 had been established as a completed subdivision, with the 32 lots recorded and ready for sale, Lazarus offered to sell the subdivision as a single parcel to two different people, but neither was interested in purchasing the property at the price fixed by Lazarus. One of those individuals, David Howard, had property adjacent to Lazarus' property. Howard had already subdivided his property and was near the end of selling the lots. He was selling them at from $2,950 to $3,500 per lot. Lazarus offered to sell Howard all the lots in Tract 14471 for cash at $2,500 per lot. However, Howard was not buying for cash but on terms, and he considered Lazarus' price too high for a cash purchase.

22. Lazarus sold the lots in Tract 14471 through an independent real estate broker named John Bohannon, who handled any kind of real estate. The initial approach between the parties was from Bohannon to Lazarus. Bohannon was looking for listings of property for sale. When Bohannon took on the assignment for the sale of Lazarus' property, he was sharing an office with another real estate broker, whose name was Harder and who operated under the name of Harder Realty Company. The office was located about four blocks from Lazarus' property, and Bohannon continued to occupy that office while engaged in the sale of Lazarus' lots. At one time, Bohannon and Lazarus discussed the matter of Bohannon's establishing an office on Lazarus' property, but Bohannon decided not to do so because he could not afford to maintain two offices and he feared that, if he gave up his existing location, the space would be taken over by a competing broker. Bohannon's office rent and all his other office expenses were paid by Bohannon.

23. On November 30, 1949, Lazarus sold the house referred to in finding 9. The sale contract, which provided for the payment of $23,500 to Lazarus, not only included the house itself and a 1½-acre parcel of the orange grove where the house was situated, but it also included the stable and enough of the chain-link fence that had been built around the orange grove (see finding 7) to enclose the 1½ acres. The stable was not situated on the 1½-acre parcel at the time of the sale, but it was later moved there by the purchaser. Lazarus turned over the farm machinery and equipment, with the exception of the jeep, to the purchaser of the property mentioned in this finding.

24. Although the contract for the sale of the 1½-acre parcel of land and the other property referred to in finding 23 provided that Lazarus would have an easement to enter through the buyer's gate and traverse the 1½-acre parcel in order to have access to the portion of the orange grove retained by Lazarus, so that the orange trees could be irrigated, no further farming operations were conducted by Lazarus after November 30, 1949 in connection with the orange grove or any other portion of the land referred to in findings 4 and 5 that was still retained by him. No further use was made by Lazarus of the portion of the chain-link fence around the orange grove that he retained after selling part of the fence to the purchaser of the 1½-acre parcel, and the retained portion of the

fence was sold after 1949 for $175 or $200 when the remainder of the 12-acre orange grove was subdivided into lots for sale (see finding 25). Lazarus did not claim any depreciation on farm equipment, and he did not deduct any farm expenses, in preparing his 1950 income tax return.

25. Proceedings looking toward the establishment of another subdivision for sale were completed by Lazarus on March 17, 1950. That subdivision was designated as Tract 15746. It consisted of approximately 47½ acres and was subdivided into 80 lots. Tract 15746 was made up largely of land out of the 73-acre parcel referred to in finding 4, but it also included the two parcels re-ferred to in finding 5. The portion of the orange grove retained by Lazarus after the sale of the 1½-acre parcel mentioned in finding 23 was subdivided as part of Tract 15746.

26. The Pacific Mutual Life Insur-ance Company credited a loan fund in the amount of $40,000 to Lazarus for the development of Tract 15746. This fund was subsequently disbursed by the insurance company, to the extent of $36,-217.46, in the same manner as the similar fund for Tract 14471. In addition to the amount of $36,217.46 mentioned in the preceding sentence, the following ex-penditures for the improvement of Tract 15746 were made by or on behalf of Laz-arus in 1950:

Paid to the Department of Water and Power of Los An-
    geles for installation of water main, fire hydrant, and
    service connections ............................. $8,389.34
Paid to City Engineer of Los Angeles for permit ...... 2,100.00

Hence, the total cost of the improvements that were made to Tract 15746 amounted to $46,706.80.

27. John Bohannon handled the sale of the lots in Tract 15746 for Lazarus under arrangements similar to those that had been made between the parties with respect to the sale of lots in Tract 14471. Therefore, all sales of Lazarus' lots in Tracts 14471 and 15746 were handled by Bohannon and the persons selected by him for that purpose. The form of the sales contract that was used in selling Lazarus' lots was prepared by Bohannon. It was the same form that was used by Bohannon in the sale of other properties, except for the name of the seller. Laz-arus did not participate in the sales ac-tivities, except to approve the prices that were fixed for the lots and to sign the sales contracts and the deeds to the lots as they were sold. When there was a document to be signed, Bohannon took it to Lazarus or left it for him to sign at the bank where the sales were es-crowed.

28. Lazarus did not employ any salesmen to sell lots, he did not tell Bo-hannon whom to hire as salesmen, and he did not give any directions to, or have any discussions with, Bohannon's sales-men. Lazarus did not attempt to tell Bohannon what methods to use in selling the lots. He did not have any office for the sale of the lots, he never met a single purchaser of a lot, and he never engaged in any sales activities of any kind. Laz-arus did not keep any records relating to the sale of lots, and he did not know which lots had been sold and which had not been sold.

29. Lazarus did not lend any money to Bohannon in connection with the dis-position of the lots.

30. Lazarus allowed Bohannon a com-mission of 8 percent on each sale. This commission was not excessive in relation to the customary business practice in the community.

31. Bohannon was also handling the sale of other properties and, after taking on the assignment for the sale of Laz-

arus' property, he continued to sell the other properties as well as Lazarus' lots. Bohannon employed salesmen, and they worked on all the properties that Bohannon handled, including Lazarus' property. In no instance was a salesman specifically required to restrict his efforts to any one piece of property.

32. In addition to using his salesmen for the sale of Lazarus' lots, Bohannon listed Lazarus' property with other brokers. If another broker sold a lot, he received 4 percent of the sale price. This came out of Bohannon's commission of 8 percent. Bohannon's salesmen were paid on the same basis.

33. Bohannon paid the sales expenses out of the 8 percent commission that he received from Lazarus, except that the latter, in effect, paid the bank and escrow charges and the title company's charges for the conveyances. The total of these charges in 1950 amounted to $2,689. The bank collected such charges out of the escrow account on each sale, and remitted the balance to Lazarus. That was done in accordance with the custom in the community whereby the seller of realty paid such charges in the absence of an agreement to the contrary, and this was true whether he sold lots in a subdivision or sold a single property, such as his home.

34. Bohannon spent from $700 to $1,200 per year for advertising on all the properties that he handled. His newspaper advertisements were usually general advertisements, applicable to any of the properties that he was handling, and did not relate to Lazarus' property alone. Even when an advertisement related to a particular property, the customers whom it attracted might be sold other property instead. Bohannon prepared and paid for all the advertising. Lazarus did not prepare or pay for any of it.

35. Bohannon did not place any large sign on Tract 14471, and he placed on Tract 15746 only one large sign that

cost about $50 or $75. Otherwise, he used only "For Sale" and "Sold" signs on the property. These signs, which cost from $2 to $3 each, could be used on any property, and were not applicable merely to Lazarus' lots. They were moved by Bohannon from one property to another. The only names on the signs were those of Bohannon and the Harder Realty Company. Lazarus' name did not appear on any of the signs.

36. Bohannon in some instances, without first securing Lazarus' approval, raised the prices that had been originally fixed for the lots. He did not have any authority, however, to lower prices without first securing Lazarus' approval. In this connection, as Lazarus was the owner of the property, Bohannon considered himself bound to be guided by whatever Lazarus wanted him to do. Bohannon told Lazarus everything that he was doing in connection with the sale of Lazarus' lots.

37. (a) In 1949, 25 lots in Tract 14471 and a 1½-acre parcel of unsubdivided acreage (see finding 23) were sold.

(b) In 1950 (the year that is involved in the present suit), 7 lots in Tract 14471 were sold for a total of $21,450 and 12 lots in Tract 15746 were sold for a total of $42,850, the aggregate amount derived from the sale of lots in 1950 thus being $64,300.

(c) In 1951, 22 lots in Tract 15746 were sold and, in addition, a 3-acre parcel that had been left over in setting up the two subdivisions was sold as unsubdivided acreage.

(d) In 1952, 24 lots in Tract 15746 were sold.

38. (a) The plaintiffs' income tax return for 1949 showed profits of $28,-988.02 from the sale of lots in Tract 14471, a loss from the sale of the 1½-acre parcel of land, and an over-all loss from Lazarus' activities in connection with the motion-picture theater business.[5]

5. The 1949 return indicated that a salary of $10,400 had been received from the M & S Theater Corporation, but that a loss in the amount of $11,496.23 had been sustained as a result of the abandonment of the drive-in theater project.

(b) The plaintiffs' income tax return for 1950 (the year involved in this suit) showed profits of $33,716.36 from the sale of lots in Tracts 14471 and 15746, income from interest in the amount of $1,459.76, and an income of $2,600 from Lazarus' activities in connection with the motion-picture theater business. (See finding 41.)

(c) The plaintiffs' income tax return for 1951 showed profits of $52,000 from the sale of lots in Tract 15746 and the sale of the 3-acre parcel, and an overall loss from Lazarus' activities in connection with the motion-picture theater business.

(d) The plaintiffs' income tax return for 1952 showed profits of $32,674 from the sale of lots in Tract 15746, and an overall loss from Lazarus' activities in connection with the motion-picture theater business.

39. The proceeds derived by Lazarus from the sale of lots were used by him in part to pay off his debts, in part to pay some personal expenses, and in part for expenditures in connection with his theaters, including the use of a large amount to remodel one of the theaters. None of the proceeds was ever used to buy real property for resale.

40. Lazarus never bought real estate for the purpose of resale. He never had a real estate license as broker, dealer, or salesman. His only purchases of real estate, other than those mentioned in findings 4 and 5, were of homes for himself and family. He sold a home in the early 1930's, another in 1946 or 1947, and another in 1949 (see finding 23). Subsequently, he bought a lot for the purpose of building another home for himself and family, but after the excavating was started, he had the plans changed and completed the house for sale. His business had gone completely bad, so that he could not afford the house for himself.

41. (a) On or before March 15, 1951, the plaintiffs filed a joint income tax return for the calendar year 1950, showing a net income of $9,666.46 and taxes due in the amount of $1,470.06. The return showed the plaintiffs' gross income as having been as follows:

| | |
|---|---|
| Wages, salaries, etc. | $ 2,600.00 |
| Interest | 1,459.76 |
| Half of capital gain from sale of lots [6] | 16,858.18 |
| Total adjusted gross income | $20,917.94 |

(b) From the adjusted gross income, the plaintiffs took the following deductions on their income tax return for 1950:

| | | |
|---|---|---|
| Interest paid | | $ 3,506.03 |
| Taxes | | 4,270.30 |
| Medical and dental expenses | $1,517.33 | |
| Less 5% of adjusted gross income | 1,045.90 | |
| | | 471.43 |
| Other deductions | | 3,003.72 |
| Total deductions | | $11,251.48 |

6. According to the plaintiffs' return, therefore, the total amount of the capital gain derived from the sale of lots in 1950 was $33,716.36.

(c) Exemptions in the total amount of $1,800 were claimed by the plaintiffs in their income tax return for 1950.

42. Pursuant to an examination that was made by an internal revenue agent of the plaintiffs' income tax returns for 1950 and for certain other years, of work sheets that had been prepared by the plaintiffs' accountants, and of the Pacific Mutual Life Insurance Company's records relating to disbursements out of the loan fund for improvements to Tract 15746 (see finding 26), the Director of Internal Revenue at Los Angeles, California, determined in 1954 that the profits derived by the plaintiffs from the sale of lots in 1950 amounted to $35,136.-69, instead of the amount reported by the plaintiffs ($33,716.36). The Director also concluded that such profits were ordinary income and not a capital gain. In addition, he struck out the plaintiffs' deduction for medical and dental expenses, because the amount claimed by the plaintiffs for that item ($1,517.33) was less than 5 percent of the plaintiffs' gross income in 1950, as corrected by the Director. No other corrections respecting the plaintiffs' income tax return for 1950 were made by the Director.

43. (a) The adjustments referred to in finding 42 were contained in a report that was made by the Director of Internal Revenue at Los Angeles to the plaintiffs. That report showed, under a column headed "Corrected", the same items of income and expense (except for the adjustments mentioned) as had been reported by the plaintiffs in their income tax return for 1950.

(b) The figures used by the Director of Internal Revenue in computing the plaintiffs' taxable income for 1950, after the adjustments mentioned in finding 42 had been made, were as follows:

*Income*

| | |
|---|---:|
| Wages, salaries, etc. | $ 2,600.00 |
| Interest | 1,459.76 |
| Profit from business (income from sale of lots) | 35,136.69 |
| Total adjusted gross income | 39,196.45 |

*Deductions*

| | |
|---|---:|
| Interest | 3,506.03 |
| Taxes | 4,270.30 |
| Miscellaneous deductions | 3,003.72 |
| Total deductions | $10,780.05 |
| Net income | $28,416.40 |

44. (a) Based on the adjustments mentioned in findings 42 and 43, the Director of Internal Revenue at Los Angeles assessed against the plaintiffs the amount of $5,709.74 as additional income tax allegedly due for the year 1950, the amount of $1,148.77 as penalties allegedly due under subsection (d) of Section 294 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 294(d) (the sum of $717.98 being assessed under paragraph (1) (A) and the sum of $430.79 being assessed under paragraph (2) of that subsection), the amount of $1,218.96 as interest allegedly due, and the amount of $1 as a lien fee allegedly due, or a total of $8,078.47.

(b) The plaintiffs informed the Director of Internal Revenue that they would pay the additional assessments referred to in paragraph (a) of this finding and

would then take the capital-gains issue to the United States Court of Claims.

(c) Pursuant to the assessments mentioned in paragraph (a) of this finding, the plaintiffs paid the following amounts to the defendant through the Director of Internal Revenue at Los Angeles: $1,364.66 on September 10, 1954, and $6,713.81 on September 29, 1954.

45. On February 1, 1955, the plaintiffs filed with the Commissioner of Internal Revenue, at the office of the Director of Internal Revenue, Los Angeles, California, a claim for the refund of the additional amounts collected from the plaintiffs for the year 1950. The plaintiffs stated their grounds as follows:

"In 1954 deficiencies were assessed as follows: tax—$5,709.74; penalties under Sec. 294(d)—$1,148.77. These deficiencies, together with interest provided by law, were collected by the District Director out of certain escrows. Claimant has not been able to date to determine the exact amount of interest assessed and collected, or the exact dates of collection, although numerous requests for such information have been filed with the District Director. This claim is for the entire amount of tax, penalty and interest so collected as deficiencies.

"The basis of said deficiency assessments was a change from long-term capital gain to ordinary income of certain income derived from sales of lots acquired as acreage in 1941 [should be 1943–1944]. Claimants contend that such change was error and that the said lots were capital assets within the meaning of I.R.C. 1939, Sec. 117."

46. On or about June 30, 1955, the plaintiffs filed an amendment to the claim mentioned in finding 45, showing the amount to be refunded as $8,078.47. The reasons for the amendment were stated as follows:

"This is an amendment of a claim and not an original claim. This amendment does not state a new or additional ground. The sole purpose of this amendment is to show the dates and amounts of payment, information which was not available at the time the claim was filed. The information added by this amendment was obtained from the District Director. The reason for the delay in obtaining this information is shown in the original claim. The original claim was filed Feb. 1, 1955.

"The amount shown on line 6 consists of additional tax in the sum of $5,709.74, plus interest, penalty, and other additions to tax in the sum of $2,368.73. In addition to refund claimed on line 6, claimant claims interest thereon allowed by law."

47. No action has been taken by the defendant on the plaintiffs' claim or on the claim as amended.

48. In this suit, the plaintiffs have stated that they do not contest the action of the Director of Internal Revenue at Los Angeles in increasing to $35,136.69 the figure of $33,716.36 shown by the plaintiffs on their income tax return for 1950 as the amount of the profits derived by them from the sale of lots in 1950. The plaintiffs merely object to the Director's action in treating such profits as ordinary income rather than as a capital gain.

49. The plaintiffs' profits from the sale of lots in 1950 amounted to $37,554.88, rather than $33,716.36 or $35,136.69. The manner of computing such profits is indicated in findings 50, 51, and 52.

50. (a) The total cost of Tract 14471 was $44,332.92, computed as follows:

Purchase price of land (see finding 12) ... $ 3,301.91
Cost of improvements (see finding 20) ... 41,031.01

Total ......................... 44,332.92

(b) As Tract 14471 consisted of 32 lots (see finding 21), the cost of each lot was $1,385.40, and the cost of the 7 lots that were sold in 1950 (see finding 37 (b)) was $9,697.80.

51. (a) The total cost of Tract 15746 was $61,429.11. This tract was made up in part of the two 1½-acre parcels referred to in finding 5, which were acquired for a total purchase price of $8,-600. The remainder of the tract consisted of 44½ acres out of the 73-acre parcel referred to in finding 4, which was acquired for $10,043.32. Hence, the portion of the purchase price originally paid for the 73-acre parcel that is properly allocable to the 44½ acres subsequently included in Tract 15746 is $6,122.31. The aggregate purchase price of the land included in Tract 15746 was, therefore, $14,722.31. To this should be added the sum of $46,706.80, representing the cost of the improvements that were made to Tract 15746 (see finding 26), which would result in a grand total of $61,-429.11.

(b) As Tract 15746 consisted of 80 lots (see finding 25), the cost of each lot was $767.86. Hence, the cost of the 12 lots that were sold in 1950 (see finding 37(b)) was $9,214.32.

52. The profits derived by the plaintiffs from the sale of lots in 1950 are computed as follows:

| | | |
|---|---:|---:|
| Total proceeds from sale of lots (see finding 37(b)) ....... | | $64,300.00 |
| Selling costs: | | |
| Commissions at 8 percent (see finding 30) .... | $5,144 | |
| Bank, escrow, and conveyance charges (see finding 33) ........................... | 2,689 | 7,833.00 |
| Net proceeds ............................... | | 56,467.00 |
| Costs of lots sold (see findings 50(b) and 51(b)) ......... | | 18,912.12 |
| Profits from sale of lots ....................... | | 37,554.88 |

53. (a) In addition to the profits totaling $37,554.88 derived by the plaintiffs from the sale of lots, the plaintiffs received as income in 1950 the sum of $2,600 in the form of salary to Lazarus from the M & S Theater Corporation and the sum of $1,459.76 in the form of interest.

(b) For income tax purposes, the plaintiffs had the following proper deductions for the year 1950:

| | |
|---|---:|
| Property taxes paid ........ | $3,175.47 |
| Other taxes paid .......... | 62.00 |
| Interest paid .............. | 3,492.05 |
| Total[7] ............... | 6,729.52 |

(c) In computing their income tax, the plaintiffs were entitled to three exemptions for the year 1950.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover together with interest thereon as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).

### Appendix

The distinction between the facts in the Boeing case, decided by the Court of Claims on December 3, 1958, and the facts in the case at bar are so manifest as not to require extended comment.

In the Boeing case Mr. Boeing paid all the development costs, the real estate man merely negotiated the sales. All papers were filed in Mr. Boeing's office,

---

7. On their income tax return for 1950, the plaintiffs showed deductions totaling $11,251.-48. (See finding 41(b).)

all payments were made to him. His office forwarded the contract forms to the purchaser. The salesman resided on Mr. Boeing's property, was paid a salary plus commission and had no contract with the purchaser except in negotiating the sales.

In the instant case Mr. Bohannon, the salesman, maintained his own office, which was not on the property to be sold, was paid a straight commission, handled properties other than plaintiffs', paid his own office expenses, employed other salesmen who handled properties of others as well as plaintiffs'. Bohannon prepared and paid for all advertising, used his own signs which he moved from one property to another. Lazarus had no office in connection with the sale of lots, kept no records relating to sales, and did not know which lots had been and which had not been sold. He devoted all his time to his theater interests.

In the Boeing case the plaintiff built many houses on the property. In the instant case Lazarus made only such improvements as required by ordinance for the subdivision.

In the Boeing case the plaintiff through his executive assistant organized a land company, made improvements, sold lots over a period of years, arranged for development of the Blue Ridge Addition, which included a part of the land. Improvements included clearing of land, grading of streets, installation of complete water and sewer systems, and construction of houses. He also organized the Westover Addition on which a number of houses were constructed. It was an extensive business closely supervised by Mr. Boeing or his executive assistant who, as his executive assistant, worked in Mr. Boeing's office.

In the instant case Lazarus never bought any other piece of realty, except for a home for himself. He bought the particular piece of property for a farm, which proved to be unprofitable, as I have been informed farms sometimes do, and when the loss occurred he tried to use the land for a drive-in theater which also

failed. He bought no real property for resale.

There is little kinship between the two cases.

Other recent cases bearing on the issue are Austin v. Commissioner, 9 Cir., 263 F.2d 460. See also Leary v. United States, 9 Cir., —— F.2d ——.

On the record the proceeds should be treated as capital gain.