**Theodore MORSE and Claire Morse**

**v.**

**The UNITED STATES.**

**No. 350–63.**

United States Court of Claims.
Jan. 20, 1967.

George T. Altman, Beverly Hills, Cal., attorney of record, for plaintiffs.

Mitchell Samuelson, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 4, 1965. Exceptions to the commissioner's report were filed by the defendant. The parties have filed briefs and the case has been argued orally. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiffs are entitled to recover on the claim relating to the taxability of the proceeds from the sale of the partnership interest and judgment is entered for plaintiff to that effect with the amount of recovery to be determined pursuant to Rule 47(c) (2); and since plaintiffs are not entitled to recover on the other claims asserted in the petition, the petition is dismissed as to such claims.

Commissioner White's opinion,[1] as modified by the court, is as follows:

The plaintiffs, who are a husband and wife residing in Beverly Hills, California, seek in this action to recover a refund of income tax paid for the calendar year 1958. Since the plaintiff Claire Morse is a party to the action merely because she signed a joint Federal income tax return for 1958 with her husband, and she was not otherwise involved in the transactions which gave rise to the litigation, the term "plaintiff" will generally be used throughout the opinion in the singular as referring to the plaintiff Theodore Morse.

The plaintiff has been engaged for many years as part owner and executive in the business of manufacturing women's lingerie. Allen R. Balton has been a partner of the plaintiff in the lingerie business for the past 15 years.

## SALE OF PARTNERSHIP INTEREST

In 1958, the plaintiff received $7,605.-42 as the result of a transaction which occurred on October 31, 1957, and which involved the sale by the plaintiff, on the installment basis, of a .723 percent interest in a partnership known as the Sam Berger Investment Company. In his income tax return for 1958, the plaintiff treated this amount as a capital gain.

---

1. The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

However, when the plaintiff's return for 1958 was audited by the Internal Revenue Service, it assessed a deficiency against the plaintiff with respect to this item, on the ground that the $7,605.42 constituted ordinary income rather than a capital gain. One of the issues in the present case is whether the $7,605.42 constituted a capital gain, as contended by the plaintiff, or ordinary income, as contended by the defendant.

■ An interest in a partnership is a capital asset, and ordinarily the sale of such an interest above or below the cost basis results in a capital gain or a capital loss. Kinney v. United States, 228 F.Supp. 656, 662 (W.D.La.1964). The controlling statutory provision is Section 741 of the Internal Revenue Code of 1954 (68A Stat. 248), which states in pertinent part as follows:

> In the case of a sale * * * of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale * * * of a capital asset, except as otherwise provided in section 751 (relating to * * * inventory items which have appreciated substantially in value).

Therefore, the gain which the plaintiff realized in 1958 from the disposition on October 31, 1957, of his .723 percent interest in the Sam Berger Investment Company should be regarded as a capital gain, unless "otherwise provided in section 751."

Section 751 of the Internal Revenue Code of 1954 provides in subsection (a), *inter alia*, that the amount of any money received by a transferor partner in exchange for his interest in a partnership that is "attributable to * * * inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset" (68A Stat. 250).

The evidence in the record clearly shows that the money which the plaintiff received in exchange for his .723 percent interest in the Sam Berger Investment Company was attributable to land which the partnership owned, it being the sole objective of the persons who purchased such interest (and the interests of other partners) to acquire the ownership of the partnership's land. Therefore, it is necessary to determine whether the land in question came within the category of "inventory items of the partnership" and, if so, whether the land had "appreciated substantially in value."

Subsection (d) of Section 751 of the 1954 Code defines "inventory items" to mean (among other things) "property of the partnership of the kind described in section 1221(1)" (68A Stat. 251); and Section 1221(1) of the 1954 Code expressly declares in pertinent part that "property held * * * primarily for sale to customers in the ordinary course of * * * trade or business" is outside the scope of the term "capital asset" (68A Stat. 321).

Accordingly, in determining whether the money which the plaintiff received in exchange for his .723 percent interest in the Sam Berger Investment Company should be regarded as ordinary income (the defendant's view) or as a capital gain (the plaintiff's view), it is necessary to consider in the first instance whether the land which the partnership owned on October 31, 1957 (the date when the plaintiff's interest in the partnership was sold) was "held * * * primarily for sale to customers in the ordinary course of * * * trade or business." If this primary question is answered in the affirmative, the land must be regarded as falling within the category of "inventory items," and it will then be necessary to consider the further question of whether the land of the partnership had "appreciated substantially in value." On the other hand, if the primary question is answered in the negative, it will not be necessary to consider the second question.

■ Whenever the question of whether land was held primarily for sale to customers in the ordinary course of trade

or business is raised in a tax case, the question is treated as one of fact (Friend v. Commissioner of Internal Revenue, 198 F.2d 285, 287 (10th Cir. 1952); United States v. Rosebrook, 318 F.2d 316, 319 (9th Cir. 1963)); and such question is to be answered upon the basis of a careful analysis of the facts of the particular case (Lazarus v. United States, 172 F. Supp. 421, 424, 145 Ct.Cl. 541, 545 (1959)). This requires in the present case a rather detailed statement of a complicated series of events and transactions that began in 1953.

During the period 1953–1954, six corporations designated as Hilltop Homes, Inc., Hilltop Ranchos, Inc., Hilltop Estates, Inc., Hilltop Park, Inc., Hilltop Vista, Inc., and Country Club Park Construction Co., Inc., were formed in the State of California for the purpose of acquiring real estate, developing real estate, and selling and dealing in real estate. Prior to the formation of these corporations, the individual investors who were planning to organize them executed a joint venture agreement under the date of August 28, 1953, in the names of the six prospective corporations. The purpose of the joint venture was to develop 600 homes on approximately 160 acres of land in Chula Vista, California. The joint venture was referred to in the agreement of August 28, 1953, as the "Country Club Park joint venture," and it will be similarly referred to hereafter in this opinion.

Sam Berger was instrumental in the formation of the several corporations previously mentioned and in the creation of the Country Club Park joint venture, and he held a 30 percent interest in them. Other persons were involved as shareholders in the various corporations comprising the Country Club Park joint venture, and some of them who played roles of varying importance in subsequent events were Jack Barenfeld, Samuel Glaser, and Allen R. Balton.

The plaintiff, from time to time between December 1953 and March 1954, invested in the corporations making up the Country Club Park joint venture.

His participation was secured through his partner in the lingerie business, Allen R. Balton. The plaintiff's total investment amounted to $11,250 and his proportion of the capital stock was 3⅓ percent.

The Country Club Park joint venture proceeded to develop the 160 acres of land in Chula Vista previously mentioned, by subdividing the land and constructing on it homes for sale. From time to time during this development program, the plaintiff and the other stockholders in the six corporations comprising the joint venture advanced money for the benefit of the joint venture. These advances were in addition to the initial capitalization of the several corporations, and they were usually made by the stockholders in proportion to their stock ownership.

On or about August 6, 1954, while the subdivision of the 160-acre tract of land in Chula Vista and the construction of homes thereon by the Country Club Park joint venture were in progress, a partnership was formed between Sam Berger and E. L. Freeland for the purpose of purchasing approximately 4,500 acres of land in San Diego, California.

On August 6, 1954, Sam Berger purchased, through escrow, on behalf of himself or his nominee, the 4,500 acres of land mentioned in the preceding paragraph. The land was acquired from the Kensington Heights Company for a total consideration of $4,676,666.66. Of the total purchase price, a deposit of $100,000 was to be made within 30 days of the execution of the escrow agreement; and the agreement provided that the remainder of the purchase price would be paid in 20 annual installments beginning August 6, 1955. The escrow agreement further provided in part as follows:

> Buyer shall deposit or cause to be deposited with Union Title Insurance and Trust Company * * * the sum of not less than $200,000 in cash, which sum is not a part of the purchase price of said property, for the purpose of paying for the installation of off-site improvements, water facilities, water mains, sewers and roads to and on said

property. Said sum shall be disbursed by Union Title Insurance and Trust Company upon instructions of Kensington Heights Company * * * for the payment of said costs. * * *

Pursuant to his agreement with E. L. Freeland, Sam Berger nominated the partnership to take title to the property covered by the escrow agreement mentioned in the preceding paragraph.

The funds for the initial payment of $100,000 that was to be made under the escrow agreement within 30 days from August 6, 1954, were provided by E. L. Freeland to the extent of $70,000 and by Sam Berger to the extent of $30,000.

Several weeks subsequent to August 6, 1954, a formal limited partnership agreement was executed as of August 6, 1954. This limited partnership agreement indicated that Sam Berger and E. L. Freeland were the general partners, and that Miss Margaret Lowthian, the Lake Murray Trust No. 1, the HAB Trust, and the MLB Trust were the limited partners. The document further stated that the purpose of the partnership was to carry on the business of buying, selling, and developing land upon the tract of approximately 4,500 acres previously mentioned. The partnership was to be known as the Sam Berger Investment Company.

The partnership agreement provided (among other things) that each partner, general or limited, was prohibited from selling, assigning, or transferring his interest in the partnership to any person other than another partner. The agreement further provided that "it is specifically understood and agreed that neither partner, general or limited, may sell, assign, transfer, convey, hypothecate, nor encumber his interest nor any part thereof in this limited partnership without the written consent of both general partners."

The respective interests of the general and limited partners in the Sam Berger Investment Company were as follows: general partner Sam Berger, 20 percent; general partner E. L. Freeland, 32 percent; limited partner HAB Trust, 10 percent; limited partner MLB Trust, 10 percent; limited partner Margaret Lowthian, 8 percent; and limited partner Lake Murray Trust No. 1, 20 percent.

The interests of the HAB Trust and the MLB Trust in the Sam Berger Investment Company were created by Sam Berger for the benefit of two of his sons, Harvey A. Berger and Marshall L. Berger. Sam Berger was trustee of these trusts.

The 20 percent interest in the Sam Berger Investment Company held under the name of Lake Murray Trust No. 1 was established for the benefit of Jack Barenfeld and Samuel Glaser, and represented a hidden, secret profit for them. As previously indicated, the sum of $200,000 was required for off-site improvements under the escrow agreement, and Jack Barenfeld and Samuel Glaser committed themselves to provide the $200,000 in return for a 20 percent interest in the Sam Berger Investment Company.

At the time when the Sam Berger Investment Company purchased the 4,500 acres of land previously referred to, the land was in an undeveloped state, except that approximately 600 acres had been devoted to the growing of barley for several years under a lease issued by the former owner. However, the land was considered developable for urban usage at the time of its acquisition by the Sam Berger Investment Company; and the consideration paid by the partnership for the land was a fair price if the intended use of the land was for urban development.

On October 21, 1954, the Lake Murray Development Company was formed as a California corporation for the purpose of subdividing land and constructing homes thereon for sale or rental. Sam Berger was instrumental in forming the Lake Murray Development Company. It was intended that this company should engage in a program of purchasing land from the Sam Berger Investment Company for the purpose of constructing homes thereon and then selling the homes.

The capitalization of the Lake Murray Development Company was in the amount of $5,000, and this sum was provided by the corporations comprising the Country Club Park joint venture. Hence, the individuals (including the plaintiff) owning the stock of the corporations making up the Country Club Park joint venture also owned, in effect, proportionate interests in the Lake Murray Development Company.

In order to obtain funds with which to meet the first five annual payments under the purchase agreement of August 6, 1954, the Sam Berger Investment Company on October 26, 1954, executed an option agreement with the Lake Murray Development Company, under which the latter corporation was granted an irrevocable option to purchase, within a 5-year period, a maximum of 500 acres of land within an area described in the document, such area being part of the 4,500 acres previously acquired by the Sam Berger Investment Company. The price to be paid by the Lake Murray Development Company for the land purchased under the option was $2,000 per acre.

As previously indicated in this opinion, the Sam Berger Investment Company was required under the purchase agreement of August 6, 1954, to deposit with the Union Title Insurance and Trust Company the sum of $200,000 to be used for off-site improvements on the land acquired by the partnership, and Jack Barenfeld and Samuel Glaser had made a commitment to provide this sum in exchange for a 20 percent interest in the Sam Berger Investment Company. Jack Barenfeld and Samuel Glaser fulfilled their commitment by causing $200,000 to be provided by the corporations comprising the Country Club Park joint venture, and they received a hidden, secret 20 percent interest in the Sam Berger Investment Company under the name of Lake Murray Trust No. 1. The Lake Murray Development Company was utilized as a conduit for the transfer of the money. The money was deposited with the Union Title Insurance and Trust Company for the account of the Sam Berger Investment Company, under the purchase agreement; and the Union Title Insurance and Trust Company disbursed the funds for the off-site improvements required by the terms of the purchase agreement. The Sam Berger Investment Company did not expect to repay the $200,000, and the transaction was not evidenced by any promissory note or other security instrument executed by the Sam Berger Investment Company.

In addition to granting the 500-acre option to the Lake Murray Development Company, the Sam Berger Investment Company engaged in the following activities: sold ½ acre to the Pacific Telephone and Telegraph Company; granted options to the San Diego School District for the purchase of sites for three elementary schools and a junior high school; sold a small parcel of about four acres near the westerly boundary for use as a reservoir site; granted easements for the laying of a gas line and a water line; had certain portions of the acreage rezoned as R–2 (residential) and commercial; and executed an agreement with the engineering firm of Freeland, Peterson, and Evenson to design a master plan for the development of the land owned by the company.

Within a short time after receiving the option to purchase a maximum of 500 acres of land from the Sam Berger Investment Company, the Lake Murray Development Company partially exercised its option by purchasing a 150-acre parcel of land. The Lake Murray Development Company thereupon proceeded to develop the land by constructing homes thereon and then selling the homes.

Sam Berger was president of the Lake Murray Development Company, and he was in active charge of that company's development work on the 150 acres acquired by the Lake Murray Development Company from the Sam Berger Investment Company.

Many of the bills and current expenses incurred by the Lake Murray Development Company in developing the 150-acre tract of land previously mentioned were

paid by one or more of the corporations making up the Country Club Park joint venture. Funds were freely transferred by such corporations to the Lake Murray Development Company without any evidence of formal indebtedness.

Upon learning that Jack Barenfeld and Samuel Glaser had provided for the Sam Berger Investment Company $200,000 out of the funds belonging to the corporations which comprised the Country Club Park joint venture, in return for a 20 percent interest in the Sam Berger Investment Company under the name of Lake Murray Trust No. 1, the plaintiff and the other stockholders in the corporations comprising the Country Club Park joint venture (excluding Sam Berger, Jack Barenfeld, and Samuel Glaser) contested the hidden interest of Jack Barenfeld and Samuel Glaser in the Sam Berger Investment Company. The plaintiff and his associates in the contest contended that, by virtue of the use of $200,000 belonging to the Country Club Park joint venture for the benefit of the Sam Berger Investment Company, they had a participating interest in the Sam Berger Investment Company through the Lake Murray Trust No. 1. This dispute was settled on May 7, 1956, by dividing the 20 percent limited partnership interest of the Lake Murray Trust No. 1 among all the individuals owning stock in the corporations making up the Country Club Park joint venture (excluding Sam Berger). The plaintiff and his associates in the contest paid no additional monetary consideration for their interests in the Sam Berger Investment Company. The plaintiff's interest amounted to .723 percent.

In August 1956, Carlos Tavares, representing a group of individuals which included himself and which will be referred to hereafter in the opinion as the "Tavares group," approached Sam Berger with respect to the acquisition of Mr. Berger's interest in the Sam Berger Investment Company. On August 10, 1956, Sam Berger and the Tavares group entered into a contract of sale and purchase. In this document, the seller, Sam Berger,

warranted that he held his original 20 percent interest in the Sam Berger Investment Company and that he had acquired the interests of the HAB Trust and the MLB Trust, so that he then had a 40 percent interest in the partnership. The document further stated that this 40 percent interest was conveyed by Sam Berger to the Tavares group for $950,000. It was also stated in the document as follows:

The sale which is the subject of this agreement does not contemplate that the Buyers will acquire any interest in existing partnership cash, whether in partnership bank accounts or on deposit in trust accounts of other persons. As a matter of fact, it is the intention of the parties hereto that the only asset of said partnership which the Buyers will acquire is the land * * * [owned by the partnership].

Sam Berger did not obtain the approval of E. L. Freeland or of the limited partners in the Sam Berger Investment Company before entering into the contract of sale mentioned in the preceding paragraph.

After entering into the contract with Sam Berger for the purchase of his 40 percent interest in the Sam Berger Investment Company, the Tavares group approached E. L. Freeland with respect to the acquisition of his 32 percent interest in the Sam Berger Investment Company. On November 26, 1956, the Tavares group and Mr. Freeland entered into a contract of purchase and sale, under which Mr. Freeland's interest in the Sam Berger Investment Company was conveyed to the Tavares group for a total consideration of $730,000. This contract stated that the buyers were not to receive any interest in the cash of the Sam Berger Investment Company. E. L. Freeland did not obtain the approval of the limited partners in the Sam Berger Investment Company before entering into the contract.

At the time when the Tavares group entered into the contract with E. L. Freeland mentioned in the preceding paragraph, the Tavares group also acquired

the 8 percent interest of Margaret Lowthian in the Sam Berger Investment Company.

As of November 26, 1956, the Sam Berger Investment Company still owed $4,-210,666.66 on the purchase price of the land acquired on August 6, 1954.

On October 31, 1957, after some negotiations, the Tavares group entered into a contract of purchase and sale with the limited partnership interests in the Sam Berger Investment Company (other than Margaret Lowthian, the HAB Trust, and the MLB Trust), and thereby received the limited partners' consent to the prior agreements made by the Tavares group for the purchase of other interests in the Sam Berger Investment Company, as previously outlined in this opinion. By virtue of the contract dated October 31, 1957, the Tavares group completed the acquisition of a 100 percent interest in the land owned by the Sam Berger Investment Company.

Under the contract of October 31, 1957, the Tavares group agreed to pay the limited partners, including the plaintiff a total of $600,000, in installments for their interests in the Sam Berger Investment Company, the only asset of which was stated to be land.

As of October 31, 1957, the Sam Berger Investment Company still owed slightly more than $4,000,000 on the purchase price for the land acquired on August 6, 1954.

In each of the contracts under which the Tavares group acquired interests in the Sam Berger Investment Company, the Tavares group agreed to assume the remaining liability under the escrow agreement of August 6, 1954, and the promissory note that covered the remainder due under the original purchase agreement.

During the period between the signing of the contract between Sam Berger and the Tavares group on August 10, 1956, and the signing of the contract between the limited partners and the Tavares group on October 31, 1957, no development work was performed on the land owned by the Sam Berger Investment Company, none of the land was sold or offered for sale, and no obligation or indebtedness was incurred for the account of the Sam Berger Investment Company. Some planning work was performed during the period by the Tavares group with respect to the prospective development of the land, but any expense involved in such planning work was defrayed by the Tavares group.

In view of the interlocking relationship of the Sam Berger Investment Company with the Country Club Park joint venture and the Lake Murray Development Company, both of which were actively engaged in the development of land for urban usage and related sales activities, it might be proper to hold that the Sam Berger Investment Company, despite the limited nature of its own sales activities, held its land up until August 10, 1956, primarily for sale to customers in the ordinary course of trade or business. However, this was not true after August 10, 1956. The partnership began to disintegrate, and it completely lost its original purpose, with the sale by Sam Berger on August 10, 1956, of his 40 percent interest in the partnership to the Tavares group. Thereafter, the only activity or objective of the original partnership was that of liquidation. The process of liquidating the original partnership was continued on November 26, 1956, when the Tavares group acquired the 32 percent interest of E. L. Freeland and the 8 percent interest of Margaret Lowthian in the Sam Berger Investment Company. The affairs of the partnership were completely wound up with the sale of the final 20 percent interest in the partnership by the plaintiff and his associates to the Tavares group on October 31, 1957. The Tavares group made no use whatever of the partnership as an entity, since the Tavares group went through the form of acquiring interests in the partnership for the sole purpose of acquiring the ownership of the partnership's land.

Therefore, it would be unrealistic to say that the Sam Berger Investment Company, while undergoing the process

of liquidation, held its land primarily for sale to customers in the ordinary course of trade or business. During this period, as previously indicated, no development work was performed on the land owned by the partnership, none of the land was sold or offered for sale, and no obligation or indebtedness was incurred for the account of the partnership. Furthermore, the very aspect of liquidation, previously mentioned, militates against a holding that the Sam Berger Investment Company after August 10, 1956, held its land primarily for sale to customers in the ordinary course of trade or business. In sum, all the circumstances show that, at that time, the land was being held for its appreciation in value, and not for sale in the ordinary course of trade or business. Cf. Garrett v. United States, 120 F.Supp. 193, 196, 128 Ct.Cl. 100, 104–105 (1954); Tibbals v. United States, 362 F.2d 266, 176 Ct.Cl. —— (June 10, 1966).

■ Accordingly, it appears that the partnership's land as of October 31, 1957 (when the plaintiff's interest in the partnership was sold) cannot properly be regarded as falling within the category of "inventory items," as that term is used in Sections 741 and 751 of the Internal Revenue Code of 1954. This conclusion makes it unnecessary to consider whether such land had "appreciated substantially in value."

For the reasons previously stated, the gain which the plaintiff realized in 1958 from the sale of his interest in the Sam Berger Investment Company is covered by the main provision of Section 741 of the 1954 Code, rather than by the exception stated in that section, and accordingly, such gain should be considered "as gain * * * from the sale * * * of a capital asset".

## SETTLEMENT OF LITIGATION

On August 13, 1956, the corporations comprising the Country Club Park joint venture and individual investors in those corporations (including the plaintiff) filed against Sam Berger an action for money lent, money had and received, and money paid on open book account. The complaint sought a judgment for $52,-438.97. Subsequently, the complaint was amended to include additional allegations charging Mr. Berger with fraud, misrepresentation, and diversion of income. This litigation arose out of Sam Berger's activities in connection with the Country Club Park joint venture and the Lake Murray Development Company.

On October 28, 1957, Sam Berger entered into an agreement of settlement, compromise, and release with the opposing parties, under which it was agreed that the charges against Mr. Berger would be dismissed upon the payment by Mr. Berger to the opposing parties of a total of $208,500. The settlement agreement contemplated that the payment by Mr. Berger of the $208,500 would be made over a period of 6 years.

The plaintiff's share of the $208,500 to be paid by Sam Berger over a 6-year period amounted to $13,500. During the calendar year 1958, the plaintiff received $5,000 under the settlement agreement of October 28, 1957, with Sam Berger.

In his income tax return for 1958, the plaintiff did not include as taxable income the item of $5,000 mentioned in the preceding paragraph. However, when the Internal Revenue Service audited the plaintiff's return for 1958, it determined that the sum of $5,000 constituted taxable income to the extent of $3,644, and a deficiency was assessed against the plaintiff with respect to this item.

■ The answer to the question of whether an amount received in settlement of a lawsuit constitutes taxable income is to be determined on the basis of the nature of the action settled. Carter's Estate v. Commissioner of Internal Revenue, 298 F.2d 192, 194 (8th Cir. 1962), cert. denied, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404. If the amount received in settlement represents compensation for the loss or impairment of a capital asset, such amount is not taxable as ordinary income. Durkee v. Commissioner of Internal Revenue, 162 F.2d 184, 186, 173 A.L.R. 553 (6th Cir. 1947); Jones v. Corbyn, 186 F.2d 450, 453 (10th Cir.

1950). On the other hand, if the amount received in settlement represents punitive damages on account of wrongful conduct by the person making the payment, the amount of the recovery constitutes ordinary income. Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955).

■ In this connection, the taxpayer in a case such as the present one has the burden of proving that money received in settlement of a lawsuit represents a recovery of capital, rather than ordinary income. Phoenix Coal Co. v. Commissioner of Internal Revenue, 231 F.2d 420, 423 (2nd Cir. 1956); Sager Glove Corp. v. Commissioner of Internal Revenue, 311 F.2d 210, 211 (7th Cir. 1962), cert. denied, 373 U.S. 910, 83 S.Ct. 1298, 10 L.Ed. 2d 411 (1963).

In the present case, it has been noted that the litigation out of which the settlement arose was first instituted on the basis of money lent, money had and received, and money paid on open book account—i. e., for the recovery of capital—and the complaint originally sought a judgment for $52,438.97. However, the complaint was later amended to include additional allegations charging Mr. Berger with fraud, misrepresentation, and diversion of income—i. e., malfeasance. Therefore, in the absence of evidence to the contrary, it is reasonable to infer that when the litigation was ultimately settled through the payment by Mr. Berger of a total of $208,500, not more than $52,438.-97 of the total sum represented a recovery of capital by the successful parties under the original allegations of the complaint, and that the remainder represented punitive damages recovered on account of Mr. Berger's alleged malfeasance.

In any event, the plaintiff has not introduced any evidence tending to show that more than $52,438.97 represented a recovery of capital.

■ It must be concluded, therefore, that the plaintiff has not sustained his burden of proof by establishing that the Internal Revenue Service was in error when it regarded as ordinary income $3,644 out of the $5,000 which the plaintiff received in 1958 under the settlement agreement.

SALE OF INTEREST IN LAND OPTION

As indicated in the first part of this opinion, the Lake Murray Development Company received from the Sam Berger Investment Company on October 26, 1954, an irrevocable option to purchase, within a 5-year period, a maximum of 500 acres of land at a price of $2,000 per acre; the Lake Murray Development Company partially exercised the option by purchasing 150 acres of land from the Sam Berger Investment Company; and the Lake Murray Development Company proceeded to develop the 150-acre tract by constructing homes thereon and then selling the homes.

Completion of the Lake Murray Development Company's program for the construction of homes on the 150-acre tract purchased by the corporation from the Sam Berger Investment Company was guaranteed by the Phoenix Insurance Company of Hartford, Connecticut. In turn, the plaintiff and the other investors in the corporations comprising the Country Club Park joint venture (i. e., the owners of the Lake Murray Development Company) guaranteed the Phoenix Insurance Company against loss.

The Lake Murray Development Company's project for the development of the 150-acre parcel of land previously mentioned was a failure. As a consequence, the Lake Murray Development Company became insolvent; and on May 4, 1956, it assigned to the Phoenix Insurance Company all of its assets, except that the Lake Murray Development Company retained the right under the option agreement of August 26, 1954, to purchase 200 acres of land out of the 500-acre area originally covered by the option.

Subsequently, the Lake Murray Development Company assigned this retained

interest in the option to the plaintiff and other investors who had advanced additional sums to the corporation during the course of its financial difficulties. The assignment was executed in consideration of the cancellation of claims based upon such advances.

On August 1, 1957, the assignees, as a group, gave written notice to the Sam Berger Investment Company of their intention of exercising the option, to the extent of 150 acres of land, and deposited the necessary consideration therefor with the Union Title Insurance and Trust Company.

On October 31, 1957, the assignees sold their interest in the land option to the Tavares group for $340,000, to be paid in installments. As a part of this transaction, the notice of August 1, 1957, concerning a partial exercise of the opinion was rescinded, and the deposit which the assignees had made was returned to them.

The sale of the option interest referred to in this part of the opinion was made at the same time when the plaintiff and other limited partners in the Sam Berger Investment Company conveyed their combined 20 percent interest in that company to the Tavares group. Both sales were part of a "package deal."

In 1958, the plaintiff received $3,691.85 under the contract of sale for the disposition of the option interest to the Tavares group.

In his Federal income tax return for 1958, the plaintiff treated the sum of $3,691.85 as proceeds from the sale of a capital asset, and it was similarly treated by the Internal Revenue Service in the audit of the plaintiff's 1958 income tax return. In the present litigation, however, the defendant has asserted as an affirmative defense that the $3,691.85 represents proceeds from the sale of property held by the plaintiff primarily for sale to customers in the ordinary course of his trade or business and, accordingly, that the gain must be considered as ordinary income by virtue of the provision in Section 1221(1) of the Internal Revenue Code of 1954 considered in the first part of this opinion.

Section 1234 of the Internal Revenue Code of 1954, as amended by Section 53 of the Technical Amendments Act of 1958 (72 Stat. 1606, 1644), provides in subsection (a) as follows:

Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

Therefore, it is necessary to determine in this case whether, if the 200 acres of land covered by the option which the plaintiff and his associates sold to the Tavares group on October 31, 1957, had actually been acquired by the plaintiff and his associates, the plaintiff's interest in such land would have constituted a capital asset.

In this connection, it has been noted in the first part of this opinion that Section 1221(1) of the Internal Revenue Code of 1954 expressly declares that property held primarily for sale to customers in the ordinary course of trade or business is outside the scope of the term "capital asset." Hence, the present task is to determine whether, if the 200 acres of land had been acquired by the plaintiff and his associates under the option on October 31, 1957, the plaintiff's interest in such a tract would have been held by him primarily for sale to customers in the ordinary course of trade or business.

Both the plaintiff, when he prepared his income tax return for 1958, and the Internal Revenue Service, when it audited the plaintiff's return for 1958, took the position that the sale of the plaintiff's interest in the land option constituted the sale of a capital asset, and, hence, that the plaintiff's interest in the 200-acre tract, if the land had been acquired, would not have been held by the plaintiff

primarily for sale to customers in the ordinary course of his trade or business. I believe that the plaintiff and the IRS were correct.

As indicated in the first part of this opinion, the question of whether land is held primarily for sale to customers in the ordinary course of trade or business is one of fact and is to be answered upon the basis of a careful analysis of the facts of the particular case.

The plaintiff has, for many years, been engaged full-time in the business of manufacturing women's lingerie. The only evidence in the record respecting sales by the plaintiff of land or interests in land (other than those previously mentioned in this opinion) indicates that on March 16, 1955, the plaintiff sold a hotel property which he had acquired on August 31, 1954; that on September 17, 1958, he sold a building and lot which he had acquired on January 26, 1949; and that on July 31, 1961, the plaintiff sold his private residence, which he had acquired in August 1955. The evidence does show that the plaintiff owned interests in, and received income from, several pieces of real estate other than those mentioned in the preceding sentence, but he testified at the trial that he acquired and held such realty for investment purposes, and there is no evidence to rebut the plaintiff's testimony in this respect.

 On the whole record, I do not believe that there is a reasonable basis for a finding that the plaintiff was engaged in the business of selling land or interests in land to customers on October 31, 1957, or that, if the plaintiff and his associates had exercised the 200-acre option on that date, the plaintiff's interest in the land thus acquired would have been held by him primarily for sale to customers in the ordinary course of his trade or business.

I am not unmindful of the fact that the plaintiff was a shareholder in the corporations comprising the Country Club Park joint venture and, as such, that he also owned, in effect, an interest in the Lake Murray Development Company, and that both the Country Club Park joint venture and the Lake Murray Development Company were clearly engaged in the business of acquiring sizeable tracts of land, subdividing the land, building homes on the smaller parcels, and then selling the homes. However, the plaintiff did not personally take part in the management or other activities of these corporations; and I do not believe that he could properly be held to be engaged in the business of selling land to customers merely because he owned stock in corporations that were engaged in that type of business. Gordy, 36 T.C. 855, 859–860 (1961).

It is my opinion, therefore, that the sale by the plaintiff of his interest in the land option on October 31, 1957, did not constitute the sale of property held by the plaintiff primarily for sale to customers in the ordinary course of *his* trade or business, but instead constituted the sale of a capital asset, and that the gain received by the plaintiff in 1958 from such transaction should be regarded as a capital gain, under Section 1234(a) of the Internal Revenue Code of 1954, as amended.

It necessarily follows that the defendant's affirmative defense with respect to the item considered in this part of the opinion cannot properly be sustained.

EXPENSES

Completion of the Lake Murray Development Company's program for the construction of homes on the 150-acre tract purchased by the corporation from the Sam Berger Investment Company was guaranteed by the Phoenix Insurance Company of Hartford, Connecticut. In turn, the plaintiff and the other investors owning interests in the Lake Murray Development Company guaranteed the Phoenix Insurance Company against loss.

Under the guaranty which the plaintiff and the other investors in the Lake Murray Development Company had made to the Phoenix Insurance Company, the plaintiff was required in 1958 to pay to Phoenix a total of $6,670 as his part of the guaranty, and he also paid legal fees

amounting to $1,220.79 in connection with this matter.

Also, in connection with the sale by the plaintiff of his interest in the 200-acre option discussed in the preceding part of this opinion, the plaintiff incurred in 1958 expenses amounting to $213.07.

One of the issues in the present case is whether the amounts of $6,670, $1,220.79, and $213.07 mentioned in this part of the opinion were wholly deductible in 1958 (as contended by the plaintiff), or whether (as determined by the Internal Revenue Service when it audited the plaintiff's income tax return for 1958) these amounts should be regarded as part of the cost basis for the land option which the plaintiff and his associates received as part of the over-all settlement between the Lake Murray Development Company and the Phoenix Insurance Company, and, therefore, since the proceeds derived by the plaintiff from the sale of the option were reported by him for income tax purposes in the returns for the different years in which such proceeds were actually received in installments, the costs should similarily be allocated on a pro rata basis among the several years in which proceeds were received.

The defendant introduced evidence at the trial, through a representative of the Internal Revenue Service, relative to the reasoning behind the agency's action respecting these expense items. The plaintiff, on the other hand, did not introduce any evidence to show that the IRS committed error.

■■ A determination by the Internal Revenue Service that certain expenditures were not ordinary expenses in the course of doing business, but rather were in the nature of a capital outlay, is presumed to be correct, and a taxpayer has the burden of disproving it. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). Therefore, the plaintiff in the present case has not sustained his burden of proof by introducing evidence to prove that the Internal Revenue Service incorrectly handled the items mentioned in this part of the opinion.